This Opinion is a
Precedent of the TTAB

Mailed: November 23, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE
————

Trademark Trial and Appeal Board
————

*In re tapio GmbH*
————

Serial No. 87941532
————

Deborah J. Peckham of Burns & Levinson LLP,
    for tapio GmbH.

Christopher Buongiorno, Trademark Examining Attorney, Law Office 102,
    Mitchell Front, Managing Attorney.

————

Before Taylor, Adlin, and Johnson,
    Administrative Trademark Judges.

Opinion by Johnson, Administrative Trademark Judge:

tapio GmbH ("Applicant") seeks registration on the Principal Register of the mark

TAPIO (in standard characters) for goods and services identified as:

> Computer application software for unifying, accessing, hosting, managing, maintaining, interacting with, communicating with and between, controlling and sharing cloud based Internet of Things devices and services; Downloadable cloud-based software for unifying, accessing, hosting, managing, maintaining, interacting with, communicating with and between, controlling and sharing cloud based Internet of Things devices and services, in International Class 9;

On-line advertising on a computer network; providing business information via a web site; provision of an on-line marketplace for buyers and sellers of goods and services; search engine optimization for sales promotion, in International Class 35;

Providing telecommunications connections to a global computer network; providing access to databases; providing telecommunications access for device connectivity via computer networks; providing telecommunications access for mobile device connectivity by means of a host platform on the Internet; transmission of IoT (Internet of Things) data and wireless data network services for others, namely, electronic transmission of data related to connectivity, device management, and memory storage via wireless networks; providing access to the Internet for communication, transmission and distribution of information and data via computer networks and the Internet; providing access to telecommunication networks and global computer networks for Internet of Things (IoT) systems, in International Class 38;

IoT Platform service provider, namely, platform as a service (PAAS) featuring computer software platforms for unifying device and user data for manufacturers and users of IoT devices, accessing device and user data for manufacturers and users of IoT devices, hosting device and user data for manufacturers and users of IoT devices, managing device and user data for manufacturers and users of IoT devices, maintaining device and user data for manufacturers and users of IoT devices, collecting device and user data for manufacturers and users of IoT devices and analyzing device and user data for manufacturers and users of IoT devices; IoT Platform service provider, namely, platform as a service (PAAS) featuring computer software platforms for controlling of IoT devices; IoT Platform service provider, namely, platform as a service (PAAS) featuring computer software platforms to provide access from websites, mobile applications, mobile and smart devices; providing temporary use of online, non-downloadable computer software applications for unifying device and user data for manufacturers and users of IoT devices, accessing device and user data for manufacturers and users of IoT devices, hosting device and user data for manufacturers and users of IoT devices, managing device

and user data for manufacturers and users of IoT devices, maintaining device and user data for manufacturers and users of IoT devices, collecting device and user data for manufacturers and users of IoT devices and analyzing device and user data for manufacturers and users of IoT devices; providing temporary use of online, non-downloadable computer software applications for controlling IoT devices; providing temporary use of online, non- downloadable computer software applications to provide access from websites, mobile applications, mobile and smart devices; Providing a web hosting platform for accessing device and user data for manufacturers and users of IoT devices, hosting device and user data for manufacturers and users of IoT devices, managing device and user data for manufacturers and users of IoT devices, maintaining device and user data for manufacturers and users of IoT devices, collecting device and user data for manufacturers and users of IoT devices and analyzing device and user data for manufacturers and users of IoT devices; providing a web hosting platform for controlling IoT devices; Conversion of computer programs and data, other than physical conversion; hosting computer web sites for others; computer software consultancy; research and development of new products for others; customized computer software design for others; computer programming services for others, in International Class 42;

and for

Online social networking services, in International Class 45.[1]

---

[1] Application Serial No. 87941532 was filed on May 30, 2018 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based upon Applicant's allegation of a bona fide intention to use the mark in commerce. The International Class 9 identification of goods recited above is the original identification and is at issue in this appeal. *See* discussion *infra* Part II. All of the remaining identifications are final.

Page references to the application record are to the downloadable .pdf version of the United States Patent and Trademark Office's ("USPTO" or "Office") Trademark Status & Document Retrieval (TSDR) system. Citations to the briefs, motions, and orders on appeal are to TTABVUE, the Board's online docketing system. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014). Specifically, the number preceding TTABVUE corresponds to the docket entry number, and any number(s) following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

The Trademark Examining Attorney refused registration under Section 2(e)(4) of the Trademark Act, 15 U.S.C. § 1052(e)(4), on the ground that Applicant's proposed mark, as applied to the goods and services identified in the application, is primarily merely a surname. The Examining Attorney also refused registration based on a requirement for an amendment to the goods and services, having found that the goods as identified in International Class 9 and the services as recited in International Class 42 include indefinite terms and are therefore unacceptable.

When the Examining Attorney made the refusals final, Applicant appealed and requested reconsideration. After the Examining Attorney denied the Request for Reconsideration, the Board resumed the appeal. After the Examining Attorney filed his appeal brief, Applicant requested that the application be remanded to the Examining Attorney so that Applicant could amend the identifications in International Classes 9 and 42. Jurisdiction was restored to the Examining Attorney, who accepted Applicant's amendment as to Class 42, but continued and maintained the refusal as to the indefinite identification of the Class 9 goods and the Section 2(e)(4) refusal. We affirm both the identification requirement and the surname refusal.

## I.    Evidentiary Issue: Completion of the Record Before Appeal

The Examining Attorney requests that the Board strike the "screen shots" from Applicant's website[2] that are embedded in Applicant's Brief,[3] along with exhibits

---

[2] The words "web site" and "website" are used interchangeably in the identifications of goods and services. For consistency we will use "website" in this opinion.

[3] Applicant's Brief, 7 TTABVUE 6.

consisting of printouts from whitepages.com[4] and a declaration signed by Applicant's attorney,[5] because they were first filed with Applicant's appeal brief.[6] As to the exhibits, Applicant claims that the items were uploaded with its Request for Reconsideration, but that the exhibits do not appear in the TSDR record.[7] To be clear, although the Request for Reconsideration on TSDR does list the whitepages.com printouts and the declaration as exhibits, the documents are not included in the record. Curiously, Applicant does not offer an explanation as to why the exhibits do not appear in the TSDR record, nor does Applicant mention whether it took any measures to correct the apparent error. However, in its Reply Brief, Applicant claims the whitepages.com results "merely provide more complete excerpts from the whitepages.com results relied on by the Examining Attorney to suggest that 'Tapio' is a surname held by tens of thousands of U.S. individuals," and that it is proper to supplement the evidentiary record with such context.[8]

We decline to speculate about why the documents were not attached as exhibits to the October 9, 2019 Request for Reconsideration or why Applicant failed to raise this issue with the USPTO well before mentioning the omission in a footnote in its Appeal Brief filed nearly three months later. Ultimately, it was and is Applicant's obligation to ensure that its electronic filings are complete. *Weider Publ'ns, LLC v.*

---

[4] *Id.* at 25-36.

[5] *Id.* at 37-38.

[6] Examining Attorney's Brief, 11 TTABVUE 3.

[7] Applicant's Brief, 7 TTABVUE 8, n.2.

[8] Applicant's Reply Brief, 13 TTABVUE 2-3.

*D & D Beauty Care Co.*, 109 USPQ2d 1347, 1350-51 (TTAB 2014) (it is the duty of the party making submissions via the Board's electronic filing system, ESTTA, to ensure that the submissions have been entered into the trial record), *appeal dismissed per stipulation*, No. 14-1461 (Fed. Cir. Oct. 10, 2014); *In re Van Valkenburgh*, 97 USPQ2d 1757, 1768 n.32, 1769 (TTAB 2011) (applicant has responsibility to make sure that the record is complete prior to filing a notice of appeal).

As to Applicant's claim that it is merely providing context to the whitepages.com results relied upon by the Examining Attorney in the September 19, 2018 Office Action, we note that the whitepages.com search results offered by Applicant here are actually 543 records from a search of the last name "Tapio" in the state of "CT." The Examining Attorney's whitepages.com search yielded 71,018 summary records, or "hits," from a search of the last name "Tapio" without a limitation for a city, state, or zip code.[9] Clearly, Applicant's proffered search results are not just more complete excerpts of what the Examining Attorney already provided; the searches are different. The scope of Applicant's search is narrowed to the state of Connecticut, abbreviated in the search as "CT."[10] Therefore, the search results are different. Applicant does not explain why it limited its search to records for the state of

---

[9] Sept. 19, 2018 Office Action at 6-10.

[10] We take judicial notice of "CT" as an abbreviation for the state of Connecticut. MERRIAM- WEBSTER DICTIONARY (2020) (https://www.merriam-webster.com/dictionary/ct) (last accessed Nov. 21, 2020). The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *Threshold.TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010); *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006).

Connecticut or how such a search provides meaningful context for the Examining Attorney's nationwide search. In any event, Applicant cannot add these whitepages.com search results to the record now.[11]

Because the record in an application should be complete before the filing of an appeal, Trademark Rule 2.142(d); 37 C.F.R. § 2.142(d), we sustain the Examining Attorney's objection and decline to consider the screen shots embedded in Applicant's Brief, Applicant's whitepages.com exhibit, the declaration signed by Applicant's attorney, as well as another declaration signed on behalf of Applicant.

## II. Identification of Goods in International Class 9

In its application, Applicant initially included the following identification of goods ("Original Identification") for Class 9:

> Computer application software for unifying, accessing, hosting, managing, maintaining, interacting with, communicating with and between, controlling and sharing cloud based Internet of Things devices and services; Downloadable cloud-based software for unifying, accessing, hosting, managing, maintaining, interacting with, communicating with and between, controlling and sharing cloud based Internet of Things devices and services.[12]

The September 19, 2018 Office Action required, *inter alia,* an amended identification to clarify the goods, as they were deemed indefinite and required

---

[11] If Applicant wanted to make this additional information of record, it could have sought remand. *See In re I-Coat Co.*, 126 USPQ2d 1730, 1734 n.15 (TTAB 2018) ("The proper procedure for an applicant … to introduce evidence after an appeal has been filed is to submit a written request with the Board to suspend the appeal and remand the application for further examination."); *see also* TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1207.02 (2020).

[12] TEAS RF New Application filed May 30, 2018 at 1-2.

specification.[13] The Examining Attorney cautioned Applicant that the scope of the identification could not be expanded.

In its March 18, 2019 response, Applicant offered the following amended identification of goods for Class 9 ("First Proposed Amendment"):

> Computer application software for unifying, accessing, hosting, managing, maintaining, operating, connecting, controlling and sharing cloud based networked product design and manufacturing devices and services in the Internet of Things (Iot); Downloadable cloud-based software for unifying, accessing, hosting, managing, maintaining, operating, connecting, controlling and sharing cloud based networked product design and manufacturing devices and services in the Internet of Things (Iot).[14]

By his April 9, 2019 Final Office Action, the Examining Attorney rejected the First Proposed Amendment as exceeding the scope of the Original Identification, lacking specificity, and as being indefinite.[15] Again, the Examining Attorney cautioned Applicant that the scope of the identification could not be expanded.

On October 9, 2019, Applicant requested reconsideration and appealed. Applicant slightly modified the language in the First Proposed Amendment for the Class 9 identification of goods to create a "Second Proposed Amendment":

> Computer application software for unifying, accessing, hosting, managing, maintaining, operating, connecting, controlling and sharing cloud based networked product design machines and services and manufacturing

---

[13] Sept. 19, 2018 Office Action at 3-4. The Examining Attorney required that Applicant use specific wording to identify the goods, particularly stating that the goods "must be identified by their common commercial descriptions," and in the absence of a common commercial name, "applicant must describe the product and its intended uses." *Id*.

[14] Mar. 18, 2019 Response to Office Action at 4.

[15] Apr. 9, 2019 Final Office Action at 4.

machines and services in the Internet of Things (Iot); Downloadable cloud-based software for unifying, accessing, hosting, managing, maintaining, operating, connecting, controlling and sharing cloud based networked product design machines and services and manufacturing machines and services in the Internet of Things (Iot).[16]

On October 29, 2019, the Examining Attorney rejected the Second Proposed Amendment.[17] The Board resumed the appeal, and Applicant and the Examining Attorney filed their briefs. But Applicant also requested remand, proposing yet another amendment to the Class 9 identification of goods ("Third Proposed Amendment"):

Computer application software for unifying machines used for designing new products and for manufacturing in the Internet of Things (Iot), accessing machines used for designing new products and for manufacturing in the Internet of Things (Iot), hosting machines used for designing new products and for manufacturing in the Internet of Things (Iot), managing machines used for designing new products and for manufacturing in the Internet of Things (Iot), maintaining machines used for designing new products and for manufacturing in the Internet of Things (Iot), and controlling cloud based networked machines used for designing new products and for manufacturing in the Internet of Things (Iot); Downloadable cloud-based software for unifying machines used for designing new products and for manufacturing in the Internet of Things (Iot), accessing machines used for designing new products and for manufacturing in the Internet of Things (Iot), hosting machines used for designing new products and for manufacturing in the Internet of Things (Iot), managing machines used for designing new products and for manufacturing in the Internet of Things (Iot), maintaining machines used for designing new products and for manufacturing in the Internet of Things (Iot), and controlling cloud based

---

[16] Oct. 9, 2019 Request for Reconsideration after Final Action at 7.

[17] Oct. 29, 2019 Request for Reconsideration After Final Action Denied at 2.

> networked machines used for designing new products and for manufacturing in the Internet of Things (Iot).[18]

The Board granted Applicant's request. On remand, the Examining Attorney rejected the Third Proposed Amendment and continued the final refusal.[19] As a result of this rejection, the Original Identification remained the operative identification of goods in International Class 9.

On appeal, the refusals continued and maintained by the Examining Attorney can be summarized as follows:[20]

- The terms "operating" and "connecting" are unacceptable because they are functions not included in the Original Identification, and therefore Applicant is attempting to expand the scope of the Original Identification;

- The wording "unifying, accessing, hosting, managing, maintaining, and controlling" is indefinite because it does not indicate exactly what is unified, accessed, hosted, managed, maintained, or controlled;

- The wording "networked product design and manufacturing devices and services" is indefinite and incomplete because the nature of the goods or services being unified, accessed, hosted, managed, maintained, and controlled are not evident; and

- The term "sharing" must be further clarified.

Applicant's responses to the refusals can be summarized as follows:

- The terms "operating" and "connecting" do not expand the scope of the Original Identification of goods, and therefore, are acceptable;

- The listing of software functionalities ending with a specification on the nature of goods and services to which the functionalities apply is appropriate and acceptable; and

---

[18] Applicant's Request for Remand and Amendment, 12 TTABVUE 2-3.

[19] Apr. 20, 2020 Request for Reconsideration After Final Action Denied at 1-2.

[20] Examining Attorney's Appeal Brief, 11 TTABVUE 11-12. *See also* Sept. 19, 2018 Office Action at 3; Apr. 9, 2019 Final Office Action at 4; Oct. 29, 2019 Request for Reconsideration Denied at 2; Apr. 20, 2020 Request for Reconsideration Denied at 1-2.

- The term "sharing" is an acceptable term to identify the functionality of software.[21]

We address the proposed identifications below, in turn.

## A. Original Identification

### 1. Applicant Fails to Satisfy Its Burden to Identify the Goods with Specificity.

Every applicant must provide "[a] list of the particular goods or services on or in connection with which the applicant uses or intends to use the mark." Trademark Rule 2.32(a)(6), 37 C.F.R. § 2.32(a)(6). The U.S. Federal Circuit Court of Appeals has noted that "[t]he PTO will generally accept any identification of goods or services so long as it is 'specific, definite, clear, accurate, and concise.'" *In re Cordua Rests.*, 118 USPQ2d at 1639 (quoting the TRADEMARK MANUAL OF EXAMINING PROCEDURE § 1402.01 (Apr. 2016)). An identification that fails to enumerate the goods and services with specificity is indefinite, either because the nature of the goods or services is not clear, or because the wording is so broad that it may include goods or services in more than one class. Clarity in the identification of goods and services is crucial to the USPTO's public notice function, so it "has discretion to determine whether and how a trademark registration should include a more particularized statement of the goods for which the mark is [to] be used … ." *In re Omega SA*, 494 F.3d 1362, 83 USPQ2d 1541, 1544 (Fed. Cir. 2007). For goods or services that do not have common names, the applicant should use clear and succinct language that is

---

[21] Oct. 9, 2019 Request for Reconsideration after Final Action at 5-6; *see also* Applicant's Reply Brief, 13 TTABVUE 10.

understandable to the average person, and such language must specifically identify the goods and services in order to provide notice to the public of the scope of rights claimed by an applicant. TMEP § 1402.01 (Oct. 2018).

The Examining Attorney objects to the clause "unifying, accessing, hosting, managing, maintaining" and the terms "controlling" and "sharing" as indefinite, allegedly because those words do not indicate exactly what is unified, accessed, hosted, managed, maintained, controlled, or shared. Upon closer inspection, however, the focus of both computer application software and downloadable cloud-based software "for unifying, accessing, hosting, managing, maintaining," and "controlling and sharing" is the "cloud based Internet of Things." Thus, the focus of Applicant's computer application software and downloadable cloud based software is properly identified.

Nonetheless, we find the phrase "devices and services," as it is used in the clause, "cloud based Internet of Things devices and services," to be indefinite because the phrase is so broad that it may include goods or services in more than one class. *Cf. In re Cordua Rests.*, 118 USPQ2d at 1639 (identifications of goods or services must be "specific, definite, clear, accurate, and concise").

Therefore, the Original Identification is unacceptable.

### B. First Proposed Amendment

#### 1. Some of the Language Remains Indefinite.

Similarly, we find the clause "cloud based networked product design and manufacturing devices and services," which Applicant offered in its first proposed

amended identification, to be indefinite because the wording is so broad that it may include goods or services in more than one class. *Cf. In re Cordua Rests.*, 118 USPQ2d at 1639 (identifications of goods or services must be "specific, definite, clear, accurate, and concise").

### 2. Applicant Impermissibly Expands the Scope of the Original Identification of Goods Also.

Under Trademark Rule 2.71(a), 37 C.F.R. § 2.71(a), "[t]he applicant may amend the application to clarify or limit, but not to broaden, the identification of goods and/or services …." *See, e.g.*, *In re Jimmy Moore LLC*, 119 USPQ2d 1764, 1770 (TTAB 2016) (finding that pitch training and educational seminars for baseball and pitching exceeded the scope of the original identification of "entertainment in the nature of baseball games"). In making our determination as to whether this language exceeds the scope of the original identification, we look to the ordinary meaning of the words. *See* TMEP § 1402.07(a).

In the absence of any evidence that the terms "operating"[22] and "connecting"[23] are terms of art in the computing industry that would be encompassed by terms such as "managing," "controlling," and "accessing" as used in the original identification, we

---

[22] "Operating" is defined as "of, relating to, or used for or in operations." MERRIAM-WEBSTER DICTIONARY (2020) (https://www.merriam-webster.com/dictionary/operating) (last accessed Oct. 29, 2020). "Operations" is defined, in part, as "a single step performed by a computer in the execution of a program." MERRIAM-WEBSTER DICTIONARY (2020) (https://www.merriam-webster.com/dictionary/operations) (last accessed Oct. 29, 2020). We take judicial notice of these dictionary definitions.

[23] "Connecting" is defined as "joining or being joined." CAMBRIDGE ADVANCED LEARNER'S DICTIONARY, FOURTH EDITION (2013) (https://dictionary.cambridge.org/us/dictionary/english/connecting) (last accessed Oct. 28, 2020). We take judicial notice of this dictionary definition.

find that the inclusion of those terms in Applicant's First Proposed Amendment exceeds the scope of the Original Identification. Furthermore, the removal of the phrase "cloud based" from certain segments[24] of the identification impermissibly expands the scope of the Original Identification. Therefore, incorporating—and also, removing—this language runs afoul of the prohibition against broadening the identification.

Accordingly, Applicant's First Proposed Amendment is unacceptable.

### C.    Second Proposed Amendment

In addition to the reasons articulated in Section II.B.2., above, the Second Proposed Amendment also is unacceptable because Applicant fails to satisfy its burden to identify the goods with specificity. In this amendment, Applicant proffered the clause "cloud based networked product design machines and services and manufacturing machines and services." Instead of clarifying the identification, we find this language to be indefinite, in part because we cannot determine precisely what it means, and in part because one possible meaning appears to be so broad that it may include goods or services in more than one class (*i.e.*, product design and manufacturing machines could be classified in one class, while services featuring such machines could be classified in another). *Cf. In re Cordua Rests.*, 118 USPQ2d at 1639 (identifications of goods or services must be "specific, definite, clear, accurate, and concise").

---

[24] The Original Identification incorporated the phrase "cloud based" immediately before the phrase "Internet of Things." Such use of "cloud based" was not continued in the First Proposed Amendment.

### D.    Third Proposed Amendment

#### 1.    Applicant's Identification of Goods Is Indefinite.

We find that Applicant has not satisfied its burden to identify the goods with specificity with the phrasing Applicant proffers in the Third Proposed Amendment. The Examining Attorney objects to the indefiniteness and breadth of the phrase "for manufacturing," because the phrase "does not specifically reveal how the software functions as to manufacturing."[25] We note, again, that the first complete phrase in the Third Proposed Amendment is "[c]omputer application software for unifying machines used for designing new products and for manufacturing in the Internet of Things (Iot)"; the clause "for manufacturing in the Internet of Things (Iot)" is repeated in similar fashion throughout the amendment. The Examining Attorney also objects to the phrases "unifying machines," "accessing machines," "hosting machines," "managing machines," and "controlling cloud based network machines" as indefinite and incomplete.[26]

"Generally, an identification for 'computer software' will be acceptable as long as *both* the function/purpose *and* the field of use are set forth. However, specifying the field of use is not required when the identified software has a clear function and is not field-specific/content-specific." TMEP § 1402.03(d) (emphasis in original). After reviewing the identification, it is apparent that Applicant must specify both the function or purpose and the field of use of the software. In addition, we find that the

---

[25] Apr. 20, 2020 Request for Reconsideration After Final Action Denied at 2-3.
[26] *Id*. at 2.

- 15 -

phrase "for manufacturing" is indefinite because it does not sufficiently detail what exactly would be manufactured in the field of use, which is the Internet of Things. TMEP § 1402.01.

### 2. Applicant Impermissibly Expands the Scope of the Original Identification of Goods.

Again, according to Trademark Rule 2.71(a), Applicant cannot broaden its identification of goods. *See also In re Jimmy Moore*, 119 USPQ2d at 1770. As such, we find that Applicant's inclusion of the terms "manufacturing" and "designing" impermissibly expands the scope of the Original Identification.

Accordingly, Applicant's Third Proposed Amendment also is unacceptable.

### E. Conclusion: Identification of Goods

For the reasons discussed above, we find that Applicant has failed to satisfy the requirement for an acceptable identification of goods in Class 9.

## III. Surname Refusal

### A. Applicable Law

Trademark Act Section 2(e)(4) precludes registration on the Principal Register of a mark that is "primarily merely a surname" without a showing of acquired distinctiveness under Trademark Act Section 2(f), 15 U.S.C. § 1052(f).[27] "A mark is primarily merely a surname if the surname is the primary significance of the mark as a whole to the purchasing public." *Earnhardt v. Kerry Earnhardt, Inc.*, 864 F.3d

---

[27] The application for TAPIO does not include a claim of acquired distinctiveness under Trademark Act Section 2(f), so that issue is not before us.

1374, 123 USPQ2d 1411, 1413 (Fed. Cir. 2017) (citation and internal quotation marks omitted); *see also In re Beds & Bars Ltd.*, 122 USPQ2d 1546, 1548 (TTAB 2017); *In re United Distillers plc*, 56 USPQ2d 1220, 1221 (TTAB 2000). This expression of the test restates the rule set forth in *In re Kahan & Weisz Jewelry Mfg. Corp.*, 508 F.2d 831, 184 USPQ 421, 422 (CCPA 1975) ("[A] correct resolution of the issue can be made only after the primary significance of the mark to the purchasing public is determined … ."); *see also In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985) (citing *In re Kahan & Weisz*, 184 USPQ at 422).

When, as here, we are faced with a Section 2(e)(4) refusal of a term in standard character form with no other literal or design elements, we consider the impact the applied-for term has, or would have, on the purchasing public because "it is that impact or impression which should be evaluated in determining whether or not the primary significance of a word when applied to a product is a surname significance." *In re Harris-Intertype Corp.*, 518 F.2d 629, 186 USPQ 238, 239 (CCPA 1975) (quoting *Ex parte Rivera Watch Corp.*, 106 USPQ 145, 149 (Comm'r Pat. 1955)).

We emphasize that there is no rule as to the kind or amount of evidence necessary to show that the applied-for mark would be perceived as primarily merely a surname. This question must be resolved on a case-by-case basis. *In re Etablissements Darty et Fils*, 225 USPQ at 653. We examine the entire record to determine the primary significance of a term. If we have any doubt on the issue based on the record before us, our practice in Section 2(e)(4) cases is generally "to resolve such doubts in favor of applicant." *In re Benthin Mgmt. GmbH*, 37 USPQ2d 1332, 1334 (TTAB 1995).

In *Darty et Fils*, the Federal Circuit considered several inquiries in determining whether the purchasing public would perceive a proposed mark as primarily merely a surname, including: a) whether the applicant adopted a principal's name and uses it in a way that reveals its surname significance; b) whether the term has a non-surname "ordinary language" meaning; and c) the extent to which the term is used by others as a surname. 225 USPQ at 653. The Board's often cited "*Benthin* factors"[28] are also examples of inquiries that may lead to evidence regarding the purchasing public's perception of a term's primary significance. These inquiries are not exclusive, and any of these circumstances—alone or in combination—and any other relevant circumstances may be considered when making this determination. *In re Eximius Coffee, LLC*, 120 USPQ2d 1276, 1277-78 (TTAB 2016). For example, "[w]e also consider if there is evidence to so indicate whether the public may perceive the mark to be primarily a meaningless, coined term." *In re Adlon Brand GmbH & Co. KG*, 120 USPQ2d 1717, 1719 (TTAB 2016).

**B.    Discussion**

Using the inquiries outlined in *Benthin,* we now examine the evidence and arguments.

---

[28] In *Benthin*, we stated that "factors," or inquiries, to be considered in determining whether a term is primarily merely a surname include: (1) the degree of a surname's rareness; (2) whether anyone connected with applicant has that surname; (3) whether the term has any recognized meaning other than that of a surname; (4) whether the term has the "structure and pronunciation" of a surname; and (5) whether the stylization of lettering is distinctive enough to create a separate commercial impression. 37 USPQ2d at 1333-34. Where, as here, the mark is in standard characters, it is unnecessary to consider the fifth factor. *In re Yeley*, 85 USPQ2d 1150, 1151 (TTAB 2007).

### 1. The Extent to Which TAPIO Is Encountered as a Surname.

First, we consider the frequency of, and public exposure to, TAPIO as a surname, *In re Olin*, 124 USPQ2d 1327, 1330 (TTAB 2017), keeping in mind that "[t]he relevant question is not simply how frequently a surname appears … but whether the purchasing public for Applicant's services is more likely to perceive Applicant's proposed mark as a surname rather than as anything else." *In re Beds & Bars*, 122 USPQ2d at 1551.

In support of the surname refusal, the Examining Attorney cites evidence from the LexisNexis® public record surname database showing 200 search results out of 374 occurrences of the surname "Tapio,"[29] results from a whitepages.com database search showing 71,018 summary "hits" for the surname "Tapio,"[30] six news article clippings about five people who appear to be in the United States (including a South

---

[29] Apr. 9, 2019 Office Action at 7-17. The Examining Attorney's search results totaled 374 in number, but only the first 200 results were included in the Examining Attorney's brief.

[30] Sept. 19, 2018 Office Action at 6-10. In its brief, Applicant asserts that whitepages.com results are unreliable, citing *In re Nick Bovis*, Ser. No. 77502609, 2010 WL 4036058 at *3 (TTAB Sept. 28, 2010) (not citable as precedent), 7 TTABVUE 11-12, and as a result, the Board should ignore all whitepages.com evidence proffered by the Examining Attorney. Our findings as to the whitepages.com evidence at issue in *Nick Bovis* were based on the unique circumstances of that case; an opinion designated as not precedential is not binding upon the Board, but may be cited for whatever persuasive value it might have. TBMP §§ 101.03, 1203.02(f). Generally, the practice of citing non-precedential opinions is not encouraged. *In re Morrison & Foerster LLP*, 110 USPQ2d 1423, 1427 n.6 (TTAB 2014); *In re the Procter & Gamble Co.*, 105 USPQ2d 1119, 1120-21 (TTAB 2012). Here, we conclude that the whitepages.com evidence is probative of the purchasing public's exposure to the TAPIO surname, but because of possible duplication of names in the whitepages.com evidence, we accord less weight to it.

Dakota state senator) with the Tapio surname,[31] and a page from the Internet website of one forty-year-old construction business located in Vancouver, Washington using the founder's name, "Tapio."[32] This evidence is probative and establishes that the purchasing public is exposed to the surname TAPIO. *In re Beds & Bars*, 122 USPQ2d at 1551 (finding LexisNexis® records and news articles probative of surname exposure); *In re Gregory*, 70 USPQ2d 1792, 1795 (TTAB 2004) (finding telephone listings, articles, and websites probative of surname exposure); TMEP § 1211.01(a)(v) (explaining that even rare surnames may be primarily merely a surname if their primary significance to purchasers is that of a surname).

In challenging the refusal, Applicant spends a significant amount of time arguing that TAPIO is "an extremely rare surname," citing 2010 Census data that reveal the surname "Tapio" ranked at 65,244 in terms of popularity, specifically showing 304

---

[31] Sept. 19, 2018 Office Action at 17-19; Apr. 9, 2019 Office Action at 19-20, 30-35, 39-42. Also included are several pages from the South Dakota state senator's Internet website, (www.nealtapio.com). Apr. 9, 2019 Office Action at 27-29.

The Examining Attorney also included records showing two more individuals with the TAPIO surname: one is an attorney in Helsinki, Finland, Sept. 19, 2018 Office Action at 20; and one appears to be an inventor located in Espoo, Finland, Apr. 9, 2019 Office Action at 18. Although the entire record is examined to determine the surname significance of a term, the American purchasing public's perception of a term is determinative; records from foreign sources are generally of little probative value unless they are shown to be accessible and relevant to U.S. consumers. *See, e.g.*, *In re Wickuler-Kupper-Brauerei*, 221 USPQ 469, 470 n.2 (TTAB 1983) (copy of a Berlin, Germany telephone directory made of record by a previous Examining Attorney is of little probative value because it is the surname significance of the term in the United States which is determinative of registrability); *cf. In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1835 (Fed. Cir. 2007) (information originating on foreign websites or in foreign news publications may be relevant to discern United States consumer impression of a proposed mark if it is shown they are accessible to the United States public).

[32] Sept. 19, 2018 Office Action at 13-16 (https://tapioconstruction.com/our-story).

occurrences of the Tapio surname in America.[33] However, given the massive number of surnames in the United States, even the most common surname would represent only a small fraction of the U.S. population. *In re Gregory*, 70 USPQ2d at 1795.

Applicant then seems to suggest that "significant media attention" is a standard that needs to be met when determining whether a rare surname has primary surname significance in the minds of the purchasing public:

> Virtually none of the evidence submitted suggests that any one of the individuals referenced in the articles [offered by the Examining Attorney] has gained any media attention beyond the very limited exposure of the few articles submitted here. Not one of the articles or references appeared in national publications or a publication that is demonstrably widely-read. None of the people referenced are actors, celebrities, or national political or media figures. Indeed, two of the individuals appearing in the evidence were not even U.S. citizens. This leaves us with evidence of 6 people who have had, at best, extremely limited media exposure in the U.S. Such evidence does not support a finding that the public has been widely exposed to the surname "Tapio."[34]

---

[33] "Annex A: 2010 Census Data Showing Frequently Occurring Surnames Occurring at Least 100 Times Nationally" (https://www.census.gov/topics/population/genealogy/data/2010_ surnames.html), Mar. 18, 2019 Response to Office Action at 13-14. Applicant also included in evidence the Wikipedia.com "List of Family Name Affixes" and the Enacademic.com list of "Family Name Affixes," in which "Tapio" and its constituent parts, "tap" and "io," do not appear. *Id.* at 15-24, 25-32.

[34] Applicant's Brief, 7 TTABVUE 17-18. Applicant cites our decision in *In re Joint-Stock Co. "Baik",* 84 USPQ2d 1921 (TTAB 2007), and two non-precedential Board decisions: *In re Nick Bovis,* 2010 WL 4036058 ("Bovis" found to be an extremely rare surname, and thus, not primarily merely a surname; Office evidence found to be severely deficient), and *In re Aeromet Technologies, Inc.*, Ser. No. 76237453, 2003 WL 22273111 (TTAB Sept. 25, 2003) ("Glassōn" found not primarily merely a surname; Office evidence was deficient and duplicative, and moreover, "Glassōn" did not have the "look and feel" of a surname). Those non-precedential decisions were decided on different records. We base our decisions on the evidentiary record before us. Therefore, we are unpersuaded by the two non-precedential decisions.

We decline to adopt a heightened standard requiring "celebrity status," "national notoriety," or "significant media attention" in order to find that a surname, although not common, has sufficient public exposure to be primarily merely a surname within the meaning of Section 2(e)(4) of the Trademark Act. Applicant's analogy to our opinion in *"Baik"* is misplaced. In that case, we concluded that Baik is an extremely rare surname given the record evidence, which consisted of three bankruptcy notices, a financial report, one financial report abstract, two legal trade papers, and two general circulation newspapers (*The Indianapolis Star* and the *Los Angeles Times*). Specifically, we concluded the bankruptcy notices and financial report abstract were "not as widely read as articles for general circulation," 84 USPQ2d at 1922, and the legal trade papers "similarly would appear to have limited readership." *Id.* Considering the overall evidence, which included 456 examples of the Baik surname retrieved by a search of the Verizon superpages.com computer database, we concluded that the Baik surname "is buried in the text of the articles and would be likely to go unnoticed by most readers." *Id.*

Here, the record evidence shows the purchasing public is exposed to the TAPIO surname, and not just on a limited basis. The surname is noticeable in articles published in widely-circulated publications, namely, the *New York Times, Sacramento Bee*, and *The Huffington Post*; TAPIO is the surname of a South Dakota state senator who has received national media coverage in publications such as the *New York Times* and *The Huffington Post*; 71,018 summary "hits" for the surname "Tapio" appear in a whitepages.com database; and there is a Tapio Construction

company in Vancouver, Washington, which, given the nature of the construction business, would be expected to be encountered by a number of Americans. That is, construction companies can be expected to interact with contractors, subcontractors, suppliers, governmental entities, real estate professionals, potential buyers or renters, and many others.

Moreover, "[e]ven a rare surname may be held primarily merely a surname if its primary significance to purchasers is that of a surname." *In re Beds & Bars*, 122 USPQ2d at 1551; *see also In re Eximius Coffee*, 120 USPQ2d at 1281 ("Section 2(e)(4) makes no distinction between rare and commonplace surnames … and even a rare surname is unregistrable if its primary significance to purchasers is a surname.") (citations omitted); *In re Adlon*, 120 USPQ2d at 1720-21 (finding ADLON merely a surname despite evidence that only 75 United States individuals have that name, and pointing out that the "strictly numerical approach to a surname analysis has been squarely rejected").

We conclude from the evidence that while TAPIO is not a common surname, there is meaningful and fairly widespread public exposure to the surname throughout the United States. Accordingly, this evidence supports a finding that TAPIO is likely to be perceived by the public as a surname.

### 2. Whether TAPIO Is the Surname of Anyone Connected with Applicant.

Applicant affirmatively states—and there is no record evidence to the contrary—that "[i]t is undisputed that the mark is not the surname of anyone connected with

the Appellant."[35] *Cf. In re Integrated Embedded*, 120 USPQ2d 1504, 1506 (TTAB 2016) (evidence from Applicant's own website established that Applicant derived its name and trademark, BARR GROUP, from the surname of its Chief Technical Officer). However, the fact that no one named TAPIO is associated with Applicant does not tend to establish, one way or the other, whether the proposed mark would be perceived as a surname. *In re Gregory*, 70 USPQ2d at 1795 (the fact that "a proposed mark is not the applicant's surname, or the surname of an officer or an employee [of applicant], does not tend to establish one way or the other whether the proposed mark would be perceived as a surname"). This inquiry is neutral.

### 3. Whether TAPIO Has Any Recognized Meaning Other Than as a Surname.

Where, as here, there is evidence that the mark at issue is a surname and that it is not a term defined in a dictionary, such a circumstance tends to support a finding that the primary significance of TAPIO is as a surname. *See, e.g., In re Eximius Coffee*, 120 USPQ2d at 1280 (citing *In re Isabella Fiore LLC*, 75 USPQ2d 1564, 1566 (TTAB 2005)); *In re Etablissements Darty et Fils*, 225 USPQ at 653-54. Applicant claims TAPIO is a term Applicant coined, "intended to suggest the functionality of Applicant's software"[36] by "suggest[ing] tapping on a smart phone or tablet, combined with the common computer-related abbreviation 'I/O,' for 'input/output.'"[37] Applicant

---

[35] *Id.* at 18.

[36] *Id.* at 19.

[37] *Id.* We take judicial notice of Applicant's proffered definitions of "tap" and "I/O" as they appear in THE COMPUTER GLOSSARY, THE COMPLETE ILLUSTRATED DICTIONARY, 7TH ED. and in the IBM DICTIONARY OF COMPUTING, 10TH ED., and we take judicial notice of the definition

claims there is evidence the word TAPIO "refers to a Finnish forest or spirit god"[38] as well.

The mere existence of other non-surname meanings of a proposed mark does not preclude a finding that it is primarily merely a surname. *See* TMEP § 1211.01(a)(ii); *Mitchell Miller, PC v. Miller*, 105 USPQ2d 1615, 1621 (TTAB 2013) ("the record is devoid of evidence that the non-surname meanings of MILLER, i.e., a mill operator or a moth, are the primary significance thereof or somehow eclipse its surname significance" in connection with legal services); *In re Petrin Corp.*, 231 USPQ 902, 904 (TTAB 1986) (holding PETRIN primarily merely a surname despite applicant's argument that the mark represents an abbreviated contraction of "petroleum" and "insulation"); *see also In re Etablissements Darty et Fils*, 225 USPQ at 653-54 (holding DARTY primarily merely a surname despite applicant's argument that the mark is a play on the word "dart"). Rather, we must consider whether the non-surname meanings eclipse the surname significance of the proposed mark.

Here, the record does not reflect how frequently consumers are exposed to TAPIO as "TAP I/O," if at all. And because the mark is not "TAP I/O," the significance of TAPIO as an abbreviation is not readily apparent; the record does not reflect that Applicant expressly promotes the significance of TAPIO as an abbreviation for "tap" and "input/output" so that the purchasing public would perceive TAPIO as such. *In re Petrin*, 231 USPQ at 904. Moreover, we have no evidence to indicate that the public

---

of "tap" from the whatis.com Internet website, (https://whatis.techtarget.com/search/query?q=tap) (last accessed Oct. 29, 2020).

[38] Applicant's Brief, 7 TTABVUE 19-20.

may perceive TAPIO to be primarily a meaningless, coined term, *In re Adlon*, 120 USPQ2d at 1719, nor is there any evidence of record that the word TAPIO "refers to an East Finnish forest spirit god,"[39] or that the relevant public is aware of that meaning. Instead, the evidence in this record indicates that when American consumers encounter TAPIO, it is as a surname.

As a result, we cannot conclude that the primary significance of TAPIO to the purchasing public would be the abbreviation "TAP I/O" or an East Finnish forest spirit god, *i.e.*, something other than a surname. This factor weighs in favor of affirming the surname refusal.

### 4.     Whether TAPIO Has the Structure and Pronunciation of a Surname.

Finally, we consider whether TAPIO has the structure and pronunciation of a surname. Evidence that a term has the structure and pronunciation of a surname may corroborate a finding that the primary significance of the term is that of a surname. *See In re Giger*, 78 USPQ2d 1405, 1409 (TTAB 2006). Pertinent evidence

---

[39] In support, Applicant cites the September 19, 2018 Office Action at 2, but that Office Action does not include any evidence to support the Examining Attorney's statement made therein: "Although the word 'TAPIO' may identify an East Finnish forest spirit god in Finnish mythology, not many consumers in the United States will recognize that association and are more likely to perceive the literal element TAPIO as a surname." The Examining Attorney does not provide any evidence of the occurrence of TAPIO in Finnish mythology in any other TSDR records, and neither does Applicant. Applicant and the Examining Attorney appear to have accepted the Examining Attorney's uncorroborated statement about the occurrence of TAPIO in Finnish mythology, because the April 9, 2019 Office Action, as well as the briefs on appeal, spend time discussing the subject as if it is a commonly known fact. However, we decline to take judicial notice that TAPIO identifies an East Finnish forest spirit god of Finnish mythology, because we do not believe that this a commonly known fact, at least in the United States. *See* TBMP § 1208.04.

typically consists of other common surnames that are configured similarly and sound similar to the proposed mark. *See In re Eximius Coffee*, 120 USPQ2d at 1280.

To show that TAPIO has the structure of a surname and is pronounced like a surname, the Examining Attorney offers evidence from a whitepages.com database search showing 63,611 summary "hits" for the surname "Tapia," which is one letter different from "Tapio." In rebuttal, Applicant argues that whitepages.com evidence is of limited probative value because search results from that database are often incomplete or duplicative,[40] and that "the mere sharing of a prefix, suffix, or letter string does not result in the sort of structural similarity that is helpful" to the analysis of whether the mark is being perceived as primarily merely a surname by the purchasing public, citing *In re Adlon*, 120 USPQ2d at 1724.[41]

In *Adlon*, the Office argued that ADLON had the structure and pronunciation of a surname, but we concluded the Office's argument was unpersuasive because ADLON was compared to other purported surnames that had two syllables and ended in "LON" or "ON," such as "Dillon," "Fallon," or "Burton." *Id.* We then stated, "**[w]ith the possible exception of Ablon and Allon, which differ from ADLON by one letter**, the surnames cited are not highly similar in structure to ADLON. The mere sharing of a prefix, suffix, or letter string does not result in the sort of structural similarity that is helpful to our analysis." *Id.* (emphasis added). Here, both "Tapio"

---

[40] Applicant's Reply Brief, 13 TTABVUE 9.

[41] Applicant's Brief, 7 TTABVUE 22.

and "Tapia" are three-syllable words with nearly identical structure; they differ by only one letter. Thus, *Adlon* does not support Applicant's position.

Applicant further asserts that the proposed mark is not comprised of elements common enough in surname etymology to suggest the "look and feel" of a surname, because neither of the mark's component parts—"tap" and "io"—are common surname affixes.[42] Applicant offers evidence from the Wikipedia.com "List of family name affixes,"[43] in which "Tapio" and its parts, "tap" and "io," do not appear, as well as evidence from the Enacademic.com list of "Family name affixes,"[44] again in which "Tapio" and its parts, "tap" and "io," do not appear. Applicant also offers printouts from the OXFORD REFERENCE DICTIONARY OF AMERICAN FAMILY NAMES and the OXFORD REFERENCE DICTIONARY OF FAMILY NAMES IN BRITAIN AND IRELAND. However, neither publication identifies "Tapio" as a surname.[45]

The structure and pronunciation factor "is decidedly subjective in nature." *In re Benthin*, 37 USPQ2d at 1333; *see also In re Eximius Coffee*, 120 USPQ2d at 1280 (whether a term has the structure and pronunciation of a surname is a "decidedly subjective" inquiry). As to this inquiry, Applicant's mark is nearly identical to the surname Tapia, which is also not an uncommon surname: the Examining Attorney's results from a whitepages.com database search show 63,611 summary "hits" for the

---

[42] *Id.* at 21.

[43] Mar. 18, 2019 Response to Office Action at 15-24.

[44] *Id.* at 25-32.

[45] Applicant's Brief, 7 TTABVUE 7, n.6. We take judicial notice of online technical dictionaries and encyclopedias generally, and here, of the pages offered by Applicant.

surname "Tapia." The OXFORD REFERENCE DICTIONARY OF AMERICAN FAMILY NAMES, offered in evidence by Applicant, contains more than 70,000 of the most commonly occurring surnames in the United States. In that publication, "Tapia" is ranked 3,902 out of over 70,000 surnames. And, the surname Tapia ranks 647th (occurring 17.9 times per 100,000 persons) according to 2010 U.S. Census records for the top 1,000 surnames.[46] This evidence leads us to conclude that Applicant's mark, TAPIO, has the structure and pronunciation of a surname.

## C.    Conclusion: Surname Refusal

Balancing the results of our inquiries as discussed in *Darty et Fils* and *Benthin,* and using the evidence of record, we find that TAPIO is primarily merely a surname.

**Decision:** The refusal to register Applicant's mark, TAPIO, on the grounds that it is primarily merely a surname, is affirmed, as is the refusal based on the requirement that Applicant provide a more definite identification of goods in Class 9.

---

[46] "2010 Census Top 1000 Surnames" (https://www2.census.gov/topics/genealogy/2010surnames/Names_2010Census_Top1000.xlsx) (last accessed Oct. 29, 2020). The Board may take judicial notice of U.S. Census Bureau data and records, and we do so here. *In re Highlights for Children, Inc.*, 118 USPQ2d 1268, 1271 n.7 (TTAB 2016) (Board may take judicial notice of U.S. Census Report).